## HIDALGO COUNTY WATER IMPROVEMENT DIST. NO. 2 et al. v. FEICK.

### No. 3177.

Court of Civil Appeals of Texas. Beaumont.

Dec. 22, 1937.

Rehearing Denied Dec. 29, 1937.

Strickland Ewers & Wilkens, R. D. Cox, Jr., and O. I. Cox, all of Mission, for appellants.

Hill, Greer & Franki, of Mission, for appellee.

O'QUINN, Justice.

Feick sued the Hidalgo County Water Improvement District No. 2 (hereinafter called district), a Texas corporation, and its directors, for damages for the breach of a written contract for professional services. The contract was for Feick to represent the district before the RFC in its application for aid in refinancing its obligations, and before the PWA in its application for a loan and a grant for construction purposes connected with this water project.

The defendants answered by general demurrer, special exceptions, and general denial. They further answered specially that the contract was for compensation to be paid by the district to Feick to secure the approval of a loan to said district from the PWA and the RFC, governmental agencies, and was contrary to public policy and therefore void. They also pleaded the two-year statute of limitations against Feick's right to recover, and that the contract upon which he based his suit had been terminated by mutual consent of the parties.

The case was tried to the court with the aid of a jury. Upon the conclusion of the evidence, both parties moved for an instructed verdict. The defendants' motion was overruled, but the court granted plaintiff's motion and instructed the jury to re-turn a verdict for plaintiff, Feick, in the sum of $3,063.72, the amount sued for. The verdict was returned and judgment accordingly entered. Motion for a new trial was overruled, and the case is before us for review.

The suit grew out of the following facts: In 1932, the Hidalgo County Water Improvement District No. 2 (a Texas corporation) owned and was endeavoring to maintain and operate its water project. It was in financial trouble and desired to obtain governmental aid. Through one of its attorneys, it filed application with the RFC for a loan, which was rejected on December 19, 1932. The application was rejected, apparently, because of lack of funds by the RFC to permit the granting of the loan, and not for lack of merit in the project. At that time, and for some time prior, Feick was connected with and employed by the RFC and it was during the pendency of the application for the loan that he, Feick, became acquainted with J. E. Wilkens, the attorney representing the district in its application for a loan. Shortly after the application was rejected, Congress appropriated $50,000,000 for aid to irrigation districts. After this, Feick got in touch with the officers of the district and suggested that if it would employ him to represent it he believed he could obtain the wanted relief. He was at that time still with the RFC. This was about June, 1933. After negotiations, the district agreed to employ Feick. Four days after he received the communication employing him, he resigned from his employment with the RFC and went to Hidalgo county and began his work as financial adviser to the district, and the preparation of a new application to be filed with RFC requesting a loan. Upon the completion of the application and the assembling of necessary data to accompany same and form part thereof, Feick returned to Washington, D. C., and filed the application. This sought from RFC a refinancing loan of $1,410,000 to take care of the district's bonded debt, and it was concluded by the district and Feick, its adviser, that a loan of $1,120,000, and a grant of $480,000 should be obtained from the PWA for construction purposes in connection with said water project, and the necessary preparation of this application was made and the application filed by Feick. These two applications were prepared under the supervision and direction of Feick, with the assistance of the district's attorneys, engineers, manager, auditor, and other em-

ployees of the district. Other services to the district were performed by Feick as its financial adviser, such as drawing up a plan for the retirement of the district's outstanding bonds, securing and forming connections with a suitable bank to act as a depository where escrow agreements could be sent in forwarding their bonds by bondholders, etc. Feick reached Washington with the new applications on July 16, 1933, and immediately filed the applications with the RFC and PWA. After this, Feick kept in touch with the progress of the applications, discussed the applications with the staff members and officials of RFC and PWA, from time to time, and furnished, as required, additional data relative to the property of the district, and revised several complicated schedules relative to the matter, and furnished revised estimated costs of proposed construction, this to assist a member of PWA who was going over the application for the loan and grant.

Feick was to receive $1,000 per month for his services. August 26, 1933, the district paid him $1,000, this for the third month of his employment. There was delay in getting the applications recommended favorably, and some dissatisfaction arose on the part of the district, not because of the character of services rendered by Feick, but, we gather from the record, because of the delay in getting relief. Early in September, 1933, a severe hurricane passed over Hidalgo county and wrought heavy damages. Immediately after this storm, on September 13, 1933, J. E. Wilkens, attorney for the district, wired Feick inquiring whether there was any possibility of getting quick relief from the government in the form of an immediate loan to provide work for patrons of the district in order that "they might live and pay flat rate," etc. Feick answered fully as to the possibility of procuring quick relief, and at once took up with the proper officials the matter of expediting the public works loan to help out the distressed patrons of the district. The next day, September 14, 1933, the district, through its attorney, Wilkens, by letter discharged Feick from further services under his contract. His contract with the district provided that he should be paid $1,000 per month, and not less than $6,000, nor more than $12,000. He was paid for three months, the last being August. The suit is for the remaining $3,000, together with some accrued expenses amounting to $63.72.

After discharging Feick, the district employed a Mr. Watts to push the matter along. It appears that about the time of appellee's discharge by the district (the exact time not shown) the consideration of the applications was suspended by RFC and PWA. However, Watts went to Washington and took up the matter and the applications were eventually granted, and both loans completed. The district paid Watts something more than $8,000 for his services. It does not appear that Watts in any way changed or supplemented the applications.

Appellants' first six propositions, in different ways, assert that the court erred in rendering judgment for appellee because the contract upon which the judgment was based was contrary to public policy, and therefore void.

We have above briefly stated the contract between appellants and appellee. Tersely it was for professional services to be rendered by appellee in procuring a loan and grant from the federal government through the RFC and PWA. It is insisted by appellants that its contract with appellee was broad enough to include, and did include, as part of the services contracted by appellee to be performed for and in behalf of appellant, procuring loans and grants from RFC and PWA, government agencies, the use of his personal influence and intimate acquaintance with the department heads or officials whom he knew by reason of having himself been an official of one of such departments, and so against public policy.

We think the assignments should be overruled. The contract was one for legitimate professional services, and does not by its terms or by necessary implications contain anything illegal or tending toward illegality, nor in violation of sound morals. The insistence that because appellee was an officer and employee in the self-liquidating division of the RFC prior to the time he was employed by the district, and that some six or eight months before appellee was employed by the district, he inspected the application of the district prepared by its attorney, Wilkens, and disapproved same, his contract with the district and services rendered for it later was contrary to public policy, and so unenforceable, is without force. The first application of the district to RFC was for a self-liquidating loan—a type of construction loan—not for a loan to refinance its then existing obligations. The new application or the application prepared and filed

by appellee after his employment by the district was for a refinancing loan to retire or take care of its then existing bonds. Feick was never connected with the refinancing division of the RFC, nor does it appear that he was ever connected with the PWA. Certainly appellee could not be in the employment of the government as a member or employee of the departments, and at the same time be employed by and act as the agent of the district and receive pay from it for presenting its application for a loan from the department of which he was a member or employee. But we have no such case here. Feick had resigned and his resignation became fully in effect before he did any act or in any way began to serve the district. His action in this regard was entirely proper. Everything was open and above board. It has always been recognized in this country that a public official may arrange to make a livelihood in private employment in anticipation of his resignation from public office. The case of Valdès v. Larrinaga, 233 U.S. 705, 34 S.Ct. 750, 751, 58 L.Ed. 1163, directly supports the holding that there was nothing improper in Feick's resignation from RFC to accept employment with the district for the purpose of procuring a loan. That case was appealed from Puerto Rico. Plaintiff, Larrinaga, was Assistant Secretary in the Department of Interior at the time the contract sued on was made, but resigned after making the contract. Defendant, Valdes, was the owner of certain riparian lands on the River Plata and had theretofore held a franchise from the government to utilize water from the river, which franchise became forfeited. Thereafter Valdes again applied for the franchise. He wrote Larrinaga, requesting him to assist "in getting it through, and in all the rest in connection with said franchise, such as plans, projects, and in everything concerning the technical part thereof." He offered Larrinaga 10 per cent. of the profits of the concession. Larrinaga answered accepting the offer, and stating, "I hereby accept the participation of 10. per cent. of said concession in exchange of my personal or professional services without any obligation on my part" to contribute money to the exploitation. There, as here, the contention was made that the contract was against public policy and void. The contract was sustained, Mr. Justice Holmes writing the opinion, and among other things said:

"It is contended more energetically that the contract was against public policy. We shall not speculate nicely as to exactly what the law was in Porto Rico at the time when the contract was made, but shall give the plaintiff the benefit of the decisions upon which he relies, such as Hazelton v. Sheckells, 202 U.S. 71, 26 S.Ct. 567, 50 L.Ed. 939, 6 Ann.Cas. 217. But we discover nothing in the language of the letters that necessarily imports, or even persuasively suggests, any improper intent or dangerous tendency. Larrinaga had ceased to be assistant secretary, and while in that position had refused to take part in the plan. His answer, which must control if there is any difference, as the parties went ahead on it (Minneapolis & St. Louis Ry. Co. v. Columbus Rolling-Mill Co., 119 U.S. 149, 7 S.Ct. 168, 30 L.Ed. 376) binds him to help in the steps to be gone through, and in the technical part. If his help in the steps to be gone through was not to be, like the rest of his work, in the technical part alone, still there is nothing to indicate that it was of a kind that could not be stipulated for. In view of the subject-matter, a grant, it would seem, to a riparian owner, of the right to use water power for public service, the things done, such as joining in an application to the military governor for a franchise on the footing of a joint interest, or helping to present it to the Secretary of War when it came up to him, or preparing plans and specifications to be presented to the executive council of Porto Rico when the first franchise granted by the Secretary of War had been lost by not complying with its terms, have no sinister smack. We see nothing to control the decision of the district judge that the contract was not against the policy of the law."

Numerous decisions of like import could be cited, but we refer only to: Trist v. Child, 21 Wall. 441, 450, 22 L.Ed. 623; Stanton v. Embrey, 93 U.S. 548, 23 L.Ed. 983; Houlton v. Nichol, 93 Wis. 393, 67 N.W. 715, 33 L.R.A. 166, 57 Am.St.Rep. 928; Barry v. Capen, 151 Mass. 99, 23 N.E. 735, 6 L.R.A. 808; Crawford v. Imperial Irrig. Dist., 200 Cal. 318, 253 P. 726; Galveston County v. Gresham, Tex.Civ. App., 220 S.W. 560, writ refused.

Moreover, it is without dispute that Feick, before accepting employment by the district, made full disclosure to the officials and attorneys of the RFC of his proposed employment by the district, and was told by them that the employment would be en-

tirely proper. The record discloses that he discussed the matter with a member of counsel for the RFC, and with the chairman of the engineers advisory board of RFC, and with Mr. Schram of the refinancing division. He also discussed the matter with members of the board of directors of RFC, among whom were Mr. Harvey Couch, Mr. Wilson McCarthy, and Mr. Jesse Jones. None of these offered any objections to his accepting the employment.

Furthermore, the very fact of the creation by the government of the RFC and PWA and providing for their activities was an invitation to the persons and institutions for whose benefit they were established to apply for and receive the aid provided. In no other way could the relief be had. The only way the district could obtain the relief authorized was, through its agents and representatives, to file application therefor with the RFC and PWA. On the part of the state of Texas, this right was given to the district by sections 1 and 5 of article 7807e, Vernon's Ann.Civ. St., and article 7880–147u, Vernon's Ann. Civ.St. In the language of appellee, "when ·Federal and State statutes invite the District to apply for loans, and when the District, as a corporation, can act only through agents in making such applications, it is the height of foolishness to say that a contract to enable the District to carry out the statutory invitation, is contrary to public policy."

 We overrule appellants' assignment that, under article 16, § 59, of the Texas Constitution, it had no power to incur the indebtedness contemplated and attempted to be created under its contract with appellee because it had no power to incur the indebtedness so attempted to be created and incurred for in that same was not authorized by ·a vote of the qualified taxpayers of the district, and since appellee neither pleaded nor proved that a vote had been had authorizing the indebtedness evidenced by said contract, or making provision for its payment, the contract declared on was ultra vires, and· no recovery thereon could be had. The contract sued on did not create a debt within the meaning of section· 59 of article 16 of the Constitution because: (a) The record discloses that ·the contract was for personal services to· be performed within ·the current year; (b) ·the· district had ·on ·hand at the time said contract was made sufficient funds, legally and actually available,· with which to pay appellee; and (c) the parties contemplated that current revenues of the district would be sufficient to make such payment. It nowhere appeared that funds obtained from the proposed loan should be used to´ pay appellee his wages of $1,000 per month. In fact, the $3,000 paid him was paid out of current funds. McNeal v. City of Waco, 89 Tex. 83, 33 S.W. 322; Lower Colorado River Authority v. McCraw, 125 Tex. 268, 83 S.W.2d 629. Furthermore, it seems to be settled in Texas that municipal expenditures for professional services are not debts within the meaning of the Constitution requiring an election before such expenditures can be made. City of Houston v. Glover, 40 Tex. Civ.App. 177, 89 S.W. 425, writ refused.

What we have said, we think, disposes of the material questions in the case. Other assignments are presented. All of them have been considered. None of them are believed to show reversible error, and all are overruled.

It is believed that the judgment should be affirmed, and it is so ordered.

Affirmed.